## STANDARD OIL CO. v. GLOBE OIL & REFINING CO.

### Nos. 10770, 12503.

District Court, N. D. Illinois, E. D.
Dec. 11, 1934.

Dyrenforth, Lee, Chritton & Wiles, of Chicago, Ill. (Russell Wiles, George A. Chritton, and Charles J. Merriam, all of Chicago, Ill., Bruce K. Brown, of Wenona, Ill., and Edward B. Beale, of Chicago, Ill., of counsel), for plaintiff.

Arthur C. Denison, of Cleveland, Ohio, and J. Bernhard Thiess and Thorley von Holst, both of Chicago, Ill. (Jones, Addington, Ames & Seibold, of Chicago, Ill., of counsel), for defendant.

BARNES, District Judge.

Findings of Fact in Respect of the Lewis and Cooke Patent.

1. Heavier hydrocarbon oils are cracked to make gasoline. The cracking of heavier hydrocarbon oils to make gasoline is a chemical process. The separation of gasoline, kerosene, gas oil, lubricating oil, etc., is generally accomplished by distillation, advantage being taken of the fact that lighter products boil at lower temperatures than the heavier ones. Distillation is not a chemical process. The process described in the Lewis and Cooke patent is not a chemical process, and the patent is not a chemical patent.

2. Fractionation is the physical separation of mixed vapors, derived from liquids having different boiling points, into two or more fractions by cooling, which is accomplished, at least in part, by the contact of vapors rising from the still with a condensed portion of vapors from the same still, and any device by which this is accomplished is a fractionator.

3. The art of fractionation is very old; various devices such as rock towers, baffle towers, and bubble towers having been used as fractionators in the distillation art long prior to the filing date of the Lewis and Cooke patent.

4. Of the fractionators known in the art prior to 1917, the bubble tower was recognized as the most efficient. It effected the cleanest separation of product and reflux; it had much greater capacity than any other fractionator, and the large pools of liquid on the trays acted as a stabilizer on whatever operation might be going on in the still. All these advantages were well recognized in the art of distillation.

5. The art of cracking hydrocarbons under pressure, to make gasoline in bulk pressure stills and taking off the vapors and fractionating them into the desired product and into reflux, to be returned to the still for further cracking, was also very old prior to 1917.

Fractionators such as the Burton pipe, the Humphreys runback, the Hopkins device, and the Moore radiator, used by plaintiff, and the rock tower and baffle tower, were then in common use on cracking stills, and all returned reflux to the still.

6. In the use of such prior art fractionators, it was always recognized that the better the separation the less heat loss would result from the return of reflux to the still.

7. In all these prior art fractionators used on cracking stills, the degree of efficiency depended on the degree of accuracy of separation between the desired product and the heavier ends, which were to be returned as reflux to the still.

8. In atmospheric distillation of petroleum, the use of the bubble tower as a fractionator had been taught to the art by Rogers in 1871.

9. The art of distillation included, prior to 1917, the use of fractionating equipment, including the bubble tower in the distillation of alcohol, benzol, petroleum—either in atmospheric or pressure stills—liquid air, ammonia, and other products.

10. The use of the bubble tower to procure better quality and quantity of product, to obtain greater capacity, an accelerated action, and the stabilizing effects of its large pools of liquid, was well recognized prior to 1917.

11. The Lewis and Cooke patent in suit discloses merely the substitution on an old bulk pressure cracking still of the equally old bubble tower in lieu of less efficient fractionators.

12. The Lewis and Cooke patent states that the object of the patent is to obtain better quality and quantity of product and an accelerated action, and these are the very advantages which had always attended the use of the bubble tower in alcohol and other distilling operations.

13. The bubble tower was adopted commercially in the petroleum industry for atmospheric distillation at about the same time as for pressure cracking distillation; the adoption in both cases occurring when, for economic reasons, the additional cost of the expensive bubble tower was felt to be justified.

14. The adoption of the bubble tower for the bulk pressure cracking still was merely the use of a well-known tool for a well-known purpose without the exercise of the inventive faculty.

15. The use of the bubble tower on a cracking still, with return of reflux to the still, is disclosed in the prior art patents to Vaughan and Ellis.

16. Barbet discloses the use of a bubble tower on a cracking still without the return of reflux to the still, but such reflux return was, long prior to Lewis and Cooke's filing date, an old and well-known expedient in the cracking art.

17. The patents to Ellis, Barbet, and Vaughan were not cited in the Patent Office against the Lewis and Cooke application.

18. All the advantages claimed for the use of the bubble tower, namely, better quality of overhead distillate, better yield for a given coke production, better yield of gasoline, fuel economy, greater capacity, and the stabilizing effect are all due to better fractionation and to the inherent and well-known nature of the bubble tower.

19. The difference between the efficacy of the bubble tower and other fractionators such as the Humphreys runback, the Moore radiator, the Hopkins cooler, the baffle tower, and the rock tower is merely a difference in degree and not a difference in kind.

20. The bubble tower, in combination with a cracking still, merely operates in accordance with the law of its being; the large pools of liquid act, as they always acted, as a stabilizer on the entire distillatory operation; the more perfect fractionation prevents heat loss and allows heat which would otherwise be wasted to be used for the furtherance of the cracking operation; the large capacity of the bubble tower permits of a much larger heat input to the still. None of these advantages was new in the use of a bubble tower with a cracking still; all were inherent in the nature of the bubble tower and were well-known advantages of its use in the distillation of alcohol and other substances in the atmospheric distillation of petroleum and in the fractionation of the vapors of a petroleum cracking still.

21. The results obtained by the use of a bubble tower with a cracking still were neither new nor unusual.

22. The increase in production rate and in percentage of gasoline from a given amount of raw stock, the decrease in fuel consumption, the stabilizing action, the reduction in coke per unit of gasoline, are advantages merely in degree over similar advantages obtained by other less efficient fractionators, and were the obvious and to be expected

results of the use of the most efficient fractionator, namely, the bubble tower.

23. Defendant cracks in a pipe still, which at the date of the Lewis and Cooke invention was a known equivalent (generally) for a bulk still. In its process, defendant forces its gas oil stock at a pressure of over 500 pounds through a pipe coil several thousand feet long, and heats it to a temperature so high that about .25 per cent. of the oil is converted to gasoline in its travel. The mixture of tar, uncracked oil, gasoline, and gas is discharged, after admixture with fresh reduced crude oil, into an evaporating chamber at 24 pounds pressure. The addition of the reduced crude oil is an improvement not here material.

24. In the defendant's evaporator chamber, the gasoline, kerosene, and gas oil evaporate, leaving a heavy tar behind. The vapors then flow through a bubble tower like that of the patent in suit, and are rectified, as in the patent in suit, pressure distillate vapor (85 per cent. gasoline) going to a final condenser and the runback, essentially free of gasoline, being drawn from the bottom of the bubble tower and being pumped back to the pipe still. The Lewis and Cooke process of rectifying the cracked vapors by passing them through the pools of a bubble tower and returning the heavy reflux or runback to the still is thus practiced by defendant.

### Conclusions of Law in Respect of the Lewis and Cooke Patent.

■ 1. The Lewis and Cooke patent in suit is invalid as being a mere aggregation of old elements without any new result.

2. The use of the well-known bubble tower in connection with the equally old cracking still did not involve the exercise of the inventive faculty, inasmuch as each element of the combination continued to perform merely the functions which it severally discharged in the prior art.

3. Inasmuch as the bubble tower was well recognized at the time Lewis and Cooke entered the field as the best fractionating equipment known to the distillation art, no one could lawfully appropriate it to himself and exclude others from using it in any usual way for any purpose to which it might be desired to apply it.

4. The Lewis and Cooke patent in suit is anticipated by the prior art patents to Vaughan, No. 49,689, Barbet, No. 536,732, and Ellis, No. 1,396,999.

■ 5. Invention cannot be predicated upon a new use for an old device where the old device in its new environment continues to discharge the same functions which it always discharged in accordance with the law of its being.

■ 6. A mere carrying forward or more extended application of the use of the bubble tower where the results obtained differ merely in degree from the results obtained by less efficient fractionators does not constitute invention.

7. The defendant's operation infringes the Lewis and Cooke patent, if the patent is valid.

8. The bills of complaint in the consolidated causes, so far as they relate to the Lewis and Cooke patent, should be dismissed for want of equity.

### Findings of Fact in Respect of the Shaeffer and Brown Patent.

1. In any oil-cracking process, the limits of time, temperature, and pressure are vital, but these limits as expressed in the Shaeffer and Brown patent are vague and indefinite.

2. Long prior to the time that Shaeffer and Brown filed their application, it was old in the art of cracking hydrocarbons: To heat the hydrocarbons in the tubes rapidly to a high temperature followed by a decidedly lower rate of heating; to use velocity to prevent carbon deposition in the cracking coils; to provide cracking processes in which it was claimed that carbon would not collect in the system; to feed the cracked material into the bottom of a tank containing the body of liquid for the purpose of avoiding the deposition of carbon in the tank; to separate vapor from residuum and withdraw carbon containing residuum from the vapor separator; to return reflux to the cracking tubes; to operate a cracking system continuously instead of as a batch process. The Shaeffer and Brown patent comprises merely an aggregation of these old steps wherein each step functions in the combination as it did in the prior art.

3. With the exception of the residue withdrawal feature of claim 2 of the Shaeffer and Brown patent, all the steps of said patent are present in the patent to Link, No. 1,756,563, and the step of residue withdrawal is old in the art, and the addition of this step to the Link patent was merely the adoption of an old and well-known expedient.

4. Claim 1 of the Shaeffer and Brown patent does not provide for the withdrawal of residue, and is fully anticipated by the Link patent.

4½. The drawing and description of the Shaeffer and Brown patent disclose two heat zones well defined and differentiated, one containing the heating coil and the other the digesting coil. These zones are separated by substantial distances and by the size of the coil, and are contained within separate inclosing furnace structures, in one of which the oil is raised to the cracking temperature desired, and in the other of which this temperature is merely maintained.

5. Defendant has no such clearly distinguishable zones as are called for by the Shaeffer and Brown patent. Defendant has a continuous coil of the same size from inlet to outlet contained in a single furnace structure, and the contained oil has a continuously progressive higher temperature from the inlet to the outlet of the coil.

6. Shaeffer and Brown patent requires that the oil be subjected in the second or digesting zone to moderate heat sufficient only to maintain the oil at substantially the same cracking temperature.

7. In defendant's coil, the oil is not subjected to moderate heat only to maintain it at a substantial temperature, but, on the contrary, it is subjected to an increased heat sufficient to increase by two and one-half times the cracking rate.

8. Long before 1924, it had been understood in the art that the oil-cracking processes were divided into two classes, one liquid vapor and vapor phase and the second liquid phase, and that in the liquid vapor and vapor phase class the oil was converted in tubes in substantially liquid vapor or vapor form, and that in the liquid phase class the oil was heated while it was substantially in liquid form, vaporization being substantially prevented, and the continuation of the substantially liquid form insured, by an appropriate high pressure.

9. In 1924, and even later, liquid vapor and vapor phase cracking was in commercial disfavor, and cracking in liquid phase was believed to be necessary for commercial success.

10. The Shaeffer and Brown patent is limited to a liquid phase operation; sufficient pressure being applied to keep the oil in a liquid state in the cracking tube.

11. Defendant's operation is not in liquid phase, but, on the contrary, there is 85 per cent. vapor at the outlet of the cracking coil.

12. The claims in suit of the Shaeffer and Brown patent are limited to a step calling for the introduction of the oil products from the coil into a liquid body of oil in the vaporizing chamber below the level of this liquid body.

13. The defendant has no such body of liquid in its chamber, the actual liquid being of relatively small quantity and only at the very bottom of the chamber. Defendant's vaporizing chamber is filled with a mass of foam scattered through which are droplets of liquid negligible in volume as compared with the vapor, and the introduction of the effluent from the cracking coil is therefore not below a liquid level in the chamber.

14. In the Shaeffer and Brown patent the purpose of introducing the oil into the vaporizing chamber well below the level of a large body of liquid maintained in that chamber was to effect the agitation of said body, and thereby prevent the deposit of carbon in the chamber.

15. In defendant's process, the production and deposit of carbon are prevented by the cooling effect of the introduction of the reduced crude oil into the transfer line, and there is no necessity for agitation of a large liquid body in the vaporizing chamber for the purpose of preventing carbon deposition. The plaintiff's process is intended to prevent the deposition of carbon, the formation of which it takes for granted to be necessary.

### Conclusions of Law in Respect of the Shaeffer and Brown Patent.

1. The Shaeffer and Brown patent is invalid because too vague, failing to comply in this respect with the requirements of the Patent Act, 35 USCA § 33.

2. The Shaeffer and Brown patent is invalid because it comprises merely an aggregation of steps, each of which was old in the art, and, as combined by the patentees, each acts in the old way.

3. The claims in suit of the Shaeffer and Brown patent are invalid, in view of the prior art patent to Link.

4. The defendant does not infringe the claims in suit of the Shaeffer and Brown patent because defendant does not have the two zones, the heating zone and the digesting zone, of said patent.

5. The defendant does not infringe the Shaeffer and Brown patent because the claims in suit of said patent are limited to a liquid phase operation in the cracking coil, whereas the hydrocarbons in defendant's cracking coil are 85 per cent. vaporized.

6. The defendant does not infringe the claims in suit of the Shaeffer and Brown pat-

ent because defendant does not maintain in the vaporizing chamber a liquid body of oil, nor does it introduce the hydrocarbons from the cracking coil below the level of such a body.

7. The bills of complaint in the consolidated causes, so far as they relate to the Shaeffer and Brown patent, should be dismissed for want of equity.