**MINNESOTA MINING & MFG. CO. v. COE, Commissioner of Patents.**

No. 6944.

United States Court of Appeals for the District of Columbia.

Decided June 30, 1938.

H. H. Benjamin, of Washington, D. C., and Robert Coulter and William H. Abbott, both of Chicago, Ill., for appellant.

R. F. Whitehead, Solicitor, United States Patent Office, of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and STEPHENS and MILLER, Associate Justices.

MILLER, Associate Justice.

On May 24, 1930, Richard Gurley Drew applied for a patent on improvements in adhesive tape composition. Subsequently he assigned his rights to appellant. In November, 1932, the claims were rejected by the Primary Examiner, whose decision was affirmed by the Board of Appeals. Thereupon suit was commenced by appellant in the lower court under § 4915, R.S. (35 U.S. C.A. § 63). This appeal is from a decree dismissing appellant's bill.

Fourteen claims were set out in the application, all of which are involved on this appeal. Claims 1, 10, 11 and 14 are sufficiently illustrative, and are set out in the margin.[1]

The component parts of the composition constituting the subject-matter of the Drew application are rubber, a filler, a solvent and in some claims a resin, depending upon the type of rubber used. The composition of two examples set forth in his specification is as follows: (1) ten pounds of rubber, two pounds of cumaron gum or resin, one-half pound of zinc oxide; (2) two pounds of plantation rubber, five pounds of Mexican or wild rubber (high in resin content) and one pound of zinc oxide. The particular kind of rubber or resin is not relied upon as novelty. The proportions of solvents and resinous component may be varied to obtain the desired adhesive quality. This composition when used with a backer as a tape is characterized in the application as "normally pressure sensitive" and "unified". The former denotes the ability to adhere to a surface without the necessity of wetting. The term "unified" is used by the applicant to signify greater cohesion of the adhesive to the backing and *inter se* than adhesion to an outside surface to which it is applied. In other words, a unified adhesive tape, as that term is used in the application, is a tape capable of being applied by pressure alone and easily removed without damaging the surface or leaving a residue. It is this physical property of being "unified" and at the same time "pressure sensitive" which appellant contends makes its composition a new and useful product, differing in kind from that which went before.

In holding appellant's composition devoid of invention because revealed by the prior art, the Examiner relied particularly upon two references: patents to Teague, No. 1,719,948, July 9, 1929, and Healy, No. 1,752,557, April 1, 1930. His findings, so far as pertinent, are set out in the margin.[2]

---

[1] "*Claim 1.* In an adhesive tape and for use therewith, a normally pressure sensitive adhesive material comprising rubber and a tackiness-augmenting agent comprising a resin in proportions rendering the product unified, normally pressure sensitive and removable, as aforesaid.

"*Claim 10.* In an adhesive tape and for use therewith, a coating composition comprising a water insoluble, unified, pressure sensitive adhesive material, including rubber as the base material and a modifying agent for the rubber, the modifying agent and rubber being in proportions to render the coating unified and pressure sensitive.

"*Claim 11.* In an adhesive tape, an adhesive composition comprising rubber, resin, a filler and a solvent, the residuum whereof including rubber about 80%, resin about 16%, and filler about 4%, the residuum coating whereof being normally pressure sentive and unified.

"*Claim 14.* In an adhesive tape, an adhesive coating, comprising rubber about 25%, Mexican rubber, high in natural resin, about 62.5%, and zinc oxide about 12½%, the coating being normally pressure sensitive and unified."

[2] "It is clearly apparent that the adhesive disclosed by Healy fully anticipates the adhesive claimed in claims 1 to 10.

". . . Although Teague's adhesive is in emulsion form it still nevertheless is an adhesive composition possessing physical characteristics commensurate with those set forth by the applicant.

"Claims 1 to 10 are considered to read on Teague for reasons set forth and at most present unpatentable functional limitations thereover. It would be obvious for one skilled in this art to so vary Teague's proportions as to make an adhesive having the identical physical characteristics of the applicant's adhesive. Teague, page 2, lines 96-101 states that the physical characteristics of his adhesive can be widely varied by changes in proportion of ingredients.

"Claims 11 to 14 are drawn to the

The Healy patent relates to a cement for temporarily mounting sheets of material upon a common backing sheet, which cement will not stain or otherwise damage the surface and which will retain its tacky or adhesive character. A cement of this nature may be made of heat-treated crude rubber dissolved in any rubber solvent, such as 70° Baumé gasoline. A resin is not necessary but may be added to increase tackiness. One example of the proportions which may be used in the composition is: 12% degraded crepe rubber, 87½% solvent and .5% colophony, a resin. Healy states that the exact proportions may be varied over substantial limits.

The patent to Teague is for an "Adhesive Rubber Composition" and discloses an intermixture of rubber, cumaron resin, and mineral filler. In its preferred state it is viscous, stringy, smooth, and tacky. It remains tacky when dried. One example of the proportions used in the composition is: 250 parts of water, 20 parts of cumaron resin, 14 parts of spindle oil, 100 parts of rubber, and .5 parts of water soluble soap. In his specification he states that the proportions may be widely varied to meet the requirements of the use to which the adhesive is to be put.

The principal, although not the only, utility for appellant's product is as a masking tape for automobiles in the process of being painted. The universal adoption of spray-painting of automobiles created a need for a satisfactory method of controlling the application of the paint so that parts of the body surface, the glass, fittings and hardware could, when desired, be protected from the spray. Prior to the introduction of appellant's tape, three methods of masking automobiles were in use. By the first method, the surface to be protected was coated with a starch or dextrin paste and paper was then applied, much in the same manner as wall paper is applied to a wall. This, however, required a costly and laborious process of cleaning the surface upon removal of the paper. The second method employed was to mask the surface with gummed paper—ordinarily a sheet of paper with a dry, hard tack coating consisting principally of glue or gelatin on one side. To render this tape adhesive it was necessary to apply water to the coating. This method proved unsatisfactory because of the tendency of the tape to lift when the water dried out, and because when it did stick, it was very difficult to remove. In many cases it was necessary to disintegrate the paper as by scrubbing with a brush or damp cloth. The third method of masking was to apply a cloth-backed pressure sensitive tape, very similar to the kind of rubber base adhesive tape used by surgeons. The evidence showed that some of the adhesive tapes so used by the trade as masking tapes are properly described as "pressure sensitive" as that term is used in Drew's application, but are not "unified" in the sense that he used that word because they have a tendency to leave a deposit of adhesive on the surface when removed therefrom.

The need for an adhesive which would correct the faults of such masking tapes prompted Drew "to do considerable research work in an effort to have such an adhesive available, recognizing that a tape carrying an adhesive of an improved nature would be superior to that available and therefore would be in demand." There can be no question that several tapes known to the art have the combined properties of adhesiveness and cohesiveness. The term "pressure sensitive" describes nothing new and the word "unified" as used by appellant describes a new concept—if at all—only in degree. And it is in this' degree of difference—effected by its composition—that the novelty and utility of appellant's claimed invention lies.

Briefly summarized, the situation was as follows: (1) masking tapes were needed and were used in automobile and other types of painting; (2) the tapes in use were less effective than needed because in some instances they were not sufficiently adhesive, in others because they were not sufficiently cohesive; (3) the next step in the development of this particular field of industry and manufacture called for a tape

---

same invention set forth in claims 1 to 10 but these claims are more specific in reciting the proportions of the respective ingredients as well as including a filler such as zinc oxide. . . . The applicant in example 1 discloses 5 parts of rubber to 1 part of resin. Teague discloses the same ratio and Healy closely approximates that ratio. Claims 11 to 14 are therefore believed to be properly rejected as lacking invention over Teague and Healy. . . . [Moreover] one skilled in the art and knowing the purpose for which these adhesives are to be used, could so vary the proportions thereof as to produce adhesives embodying the identical physical characteristics of the applicant's adhesive."

which would be "pressure sensitive", i. e., sufficiently adhesive upon direct application and "unified", i. e., sufficiently cohesive to be easily removable without leaving a residue after it had served its purpose; (4) Drew experimented with ingredients, the characteristics of which were generally known and used,[3] because of their adhesive and cohesive properties, and produced a tape having the comparative adhesive and cohesive properties desired; (5) his tape was accepted by the industry and was commercially successful. Was this sufficient to show invention? The Patent Office and the lower court answered the question in the negative and in our opinion that answer is correct.

▆ The use of mere skill to produce a desired improvement does not constitute invention.[4] Nor is invention found in every slight advance which is made through the skill of those who, by reason of their employment, are aware of the constant demand of industry for new and improved appliances.[5] The word skill, as used in the cases, is equally applicable to a chemist as to a mechanic, and to a laboratory as to a work-bench.[6]

▆ Invention may appear when a result is produced which had never before been produced; when its need had been long realized, and "Thousands of dollars had been spent and countless experiments had been performed in fruitless endeavors to accomplish [it] ...."[7] But a showing of great industry in experimental research is not in itself sufficient to constitute invention,[8] when the product thereof differs from those of the prior art only in degree and the result—no matter how useful it may be—is merely one step forward in a gradual process of experimentation.[9]

---

[3] See Weber, The Chemistry of Rubber Manufacture, 1926, 169, 237, 344.

[4] "The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. . . . It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures." Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438.

". . . all improvement is not invention, and entitled to protection as such. Thus to entitle it, it must be the product of some exercise of the inventive faculties, and it must involve something more than what is obvious to persons skilled in the art to which it relates." Pearce v. Mulford, 102 U.S. 112, 118, 26 L.Ed. 93. See, also, Aro Equipment Corp. v. Herring-Wissler Co., 8 Cir., 84 F.2d 619, 622.

[5] "The process of development in manufactures creates a constant demand for new appliances, which the skill of ordinary head-workmen and engineers is generally adequate to devise, and which, indeed, are the natural and proper outgrowth of such development. Each step forward prepares the way for the next, and each is usually taken by spontaneous trials and attempts in a hundred different places. To grant a single party a monopoly of every slight advance made, except where the exercise of invention somewhat above ordinary mechanical or engineering skill is distinctly shown, is

unjust in principle and injurious in its consequences." Atlantic Works v. Brady, supra note 4, at pages 199–200, 2 S.Ct. at page 231.

[6] "Obviously, if the problem which Donner solved was one which could have been solved by the ordinary chemist skilled in the art working toward the same end and under like conditions, what Donner did was not invention." Donner v. Sheer Pharmacal Corp., 8 Cir., 64 F.2d 217, 221, certiorari denied. 290 U.S. 658, 54 S.Ct. 73, 78 L.Ed. 570 (and see cases there cited). See, also, Railroad Supply Co. v. Elyria Iron & Steel Co., 244 U.S. 285, 292, 37 S.Ct. 502, 61 L.Ed. 1136.

[7] United States Industrial Chemical Co. v. Theroz Co., 4 Cir., 25 F.2d 387, 390, certiorari denied, 278 U.S. 608, 49 S.Ct. 12, 73 L.Ed. 534.

[8] See Busell Trimmer Co. v. Stevens, 137 U.S. 423, 435, 11 S.Ct. 150, 34 L.Ed. 719.

[9] Railroad Supply Co. v. Elyria Iron & Steel Co., supra note 6; David Belais, Inc. v. Goldsmith Bros. Smelting & Refining Co., 2 Cir., 10 F.2d 673, 675, certiorari denied, 271 U.S. 687, 46 S.Ct. 639, 70 L.Ed. 1152. See, also, Brady Brass Co. v. Ajax Metal Co., 3 Cir., 160 F. 84, 90, certiorari denied, 210 U.S. 433, 28 S. Ct. 762, 52 L.Ed. 1136; Western Willite Co. v. Trinidad Asphalt Mfg. Co., 8 Cir., 16 F.2d 446, 448, certiorari denied, 274 U.S. 737, 47 S.Ct. 575, 71 L.Ed. 1317.

"It may be admitted that Orcutt's later patent performed the work it was designed to accomplish in a better and more workmanlike manner than any of the preceding cutters patented, because, as already stated, there were constant improvements in the art to which it relat-

There was no new idea involved in the claimed invention in this case; nor even a new use made of an old idea.[10] It was no more than a carrying forward of the original idea of using an adhesive tape as a mask for spray-painting, which was well known in the industry. While the Drew composition constituted a more effective combination of familiar ingredients than those previously used, the result was not new within the meaning of patent law, and did not rise to the dignity of invention.[11] The use of his composition accomplished the same thing in the same way, by substantially the same means, with better results. This did not constitute such an invention as to sustain a patent.[12]

The general characteristics of rubber for adhesiveness and cohesiveness when combined with resin, fillers—such as zinc oxide—and solvents, as specified in appellant's claims, were known. Years of experimentation had been devoted to the subject of rubber adhesives, resulting in the production of many varieties of tapes, cements and other products well known to laymen as well as to those trained in the art. The final product, upon which a patent is claimed here, came as a result of this long and gradual process of experimentation and differs from those of the prior art only in degree and only as to relative adhesiveness and cohesiveness. No new element was introduced, no startling, unexpected, or radical result was produced. The change made as a result of Drew's research was a change only in form, proportion and degree, plainly indicated by the prior art.[13] It was an easy step rather than a difficult one.[14]

It is objected by appellant that neither reference relied on by the Patent Office would produce the result which he achieved. That, however, is not necessary in order to defeat its claim for a patent. "An anticipating patent, though crude and commercially undesirable, may teach one skilled in the art how to make it a com-

ed. . . . Such improvement, however, was an improvement in degree only, and was, therefore, not patentable. Burt v. Evory, 133 U.S. 349 [10 S.Ct. 394, 33 L.Ed. 647], and cases there cited." Busell Trimmer Co. v. Stevens, supra note 8, at page 435, 11 S.Ct. at page 154.

10 " . . . it is not a patentable invention to apply old and well-known devices and processes to new uses in other and analogous arts." Lovell Mfg. Co. v. Cary, 147 U.S. 623, 637, 13 S. Ct. 472, 477, 37 L.Ed. 307; Ansonia Brass & Copper Co. v. Electrical Supply Co., 144 U.S. 11, 12 S.Ct. 601, 36 L.Ed. 327; Friend v. Burnham & Morrill Co., 1 Cir., 55 F.2d 150; Leander Development Corp. v. Taft-Buick Corp., 2 Cir., 42 F.2d 823. But cf. Barry v. Harpoon Castor Mfg. Co., 2 Cir., 209 F. 207.

11 Berlin Mills Co. v. Procter & Gamble Co., 254 U.S. 156, 166, 41 S.Ct. 75, 78, 65 L.Ed. 196. See, also, Economy Fuse & Mfg. Co. v. Coe, 66 App.D.C. 294, 86 F.2d 850; Milligan & H. Glue Co. v. Upton, 97 U.S. 3, 6, 24 L.Ed. 985; Busell Trimmer Co. v. Stevens, supra note 8.

12 Smith v. Nichols, 21 Wall. 112, 118–119, 88 U.S. 112, 22 L.Ed. 566; Roberts v. Ryer, 91 U.S. 150, 23 L.Ed. 267; Belding Mfg. Co. v. Challenge Corn Planter Co., 152 U.S. 100, 14 S.Ct. 492, 38 L.Ed. 370; Market Street Cable Ry. v. Rowley, 155 U.S. 621, 629, 15 S.Ct. 224, 39 L.Ed. 284; Railroad Supply Co. v. Elyria Iron & Steel Co., supra note 6, at page 293, 37 S.Ct. at page 505; Burt v. Evory, 133 U.S. 349, 358–359 10 S. Ct. 394, 33 L.Ed. 647.

"It is the invention of what is new, and not the arrival at comparative superiority or greater excellence in that which was already known, which the law protects as exclusive property and which it secures by patent." Stearns & Co. v. Grove's Laboratories, 8 Cir., 87 F.2d 822, 824. See David Belais, Inc. v. Goldsmith Bros. Smelting & Refining Co., 2 Cir., 10 F.2d 673, certiorari denied, 271 U.S. 687, 46 S.Ct. 639, 70 L.Ed. 1152; Brady Brass Co. v. Ajax Metal Co., supra note 9. Compare the language in Bethlehem Steel Co. v. Churchward International Steel Co., 3 Cir., 268 F. 361, certiorari denied, 255 U.S. 572, 41 S.Ct. 376, 65 L.Ed. 792; Francis v. Mellor, 9 Fed.Cas. 685, No. 5039, 5 Fish.Pat.Cas. 153, 159. See 1 Walker, Patents, Deller's ed. 1937, § 37; In re Coffield, 50 App.D.C. 259, 270 F. 695.

13 See cases cited in notes 9 and 12 supra, and see, also, Brown v. Piper, 91 U.S. 37, 41, 23 L.Ed. 200; Pennsylvania R. R. v. Locomotive Engine Safety Truck Co., 110 U.S. 490, 494, 4 S.Ct. 220, 28 L. Ed. 222; Dreyfus v. Searle, 124 U.S. 60, 64, 8 S.Ct. 390, 31 L.Ed. 352; Concrete Appliances Co. v. Gomery, 269 U.S. 177, 184, 185, 46 S.Ct. 42, 45, 70 L.Ed. 222; Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 473, 55 S.Ct. 449, 79 L.Ed. 997; Pick v. Coe, Nos. 6988 and 6989, —— App.D.C. ——, 99 F.2d 985, decided this day.

14 Kirsch Mfg. Co. v. Gould Mersereau Co., 2 Cir., 6 F.2d 793, 794.

mercial success without invention." Application of Talley, 53 App.D.C. 99, 101, 288 F. 453, 455. Moreover, the result is the same whether what preceded was covered by patent or, as here, rested also very largely in public knowledge and use. Smith v. Nichols, 21 Wall. 112, 119, 88 U.S. 112, 22 L.Ed. 566. In other words, it is not necessary to show who did invent a thing in order to show that a particular claimant did not. Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 401, 46 S.Ct. 324, 325, 70 L.Ed. 651.

Appellant relies upon the decision in Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523. But in that case the result produced was new and startling. As the Court said (page 55, 43 S.Ct. page 325): "The defendant's witnesses [adverse to the claimant] without exception refer to that disclosure as something that surprised and startled the paper-making trade. It spread, to use the expression of one witness, like wildfire." In the present case it appears that appellant's masking tape was favorably received but there is nothing to indicate that the world of spray-painting was startled or even mildly surprised.[15] There is nothing in fact to indicate anything more than that a good article was put on the market and accepted by a willing industry. This result is one which has frequently followed the use of skill in manufacture coupled with advertising and good salesmanship.[16] It does not prove invention. "Commercial success, however, cannot supply inventive genius to a device that has none. Ability to sell is not inventive genius." Tropic-Aire, Inc. v. Sears, Roebuck & Co., 8 Cir., 44 F.2d 580, 593, certiorari denied, 282 U.S. 904, 51 S.Ct. 217, 75 L.Ed. 796.[17]

In Economy Fuse & Mfg. Co. v. Coe, 66 App.D.C. 294, 295, 86 F.2d 850, 851, we said of the invention there claimed: "While appellant has produced a moldable composition of greater strength than that of Kempton and greater moldability than that of Smith, we are constrained to rule that

[15] The facts of the present case bring it rather within the following dictum of the Eibel Case: "On the other hand, if all knew that the source of the trouble Eibel was seeking to remedy was where he found it to be, and also knew that increased speed of the stock would remedy it, doubtless it would not have been invention on his part to use the pitch of the wire to increase the speed of the stock when such pitch had been used before to do the same thing although for a different purpose and in a less degree." 261 U.S. at page 68, 43 S.Ct. at page 330.

[16] Duer v. Corbin Cabinet Lock Co., 149 U.S. 216, 223–224, 13 S.Ct. 850, 37 L.Ed. 707; International Flatstub Check Book Co. v. Young & Selden Co., 4 Cir., 284 F. 831, 832; McClain v. Ortmayer, 141 U.S. 419, 428, 12 S.Ct. 76, 79, 35 L.Ed. 800: "That the extent to which a patented device has gone into use is an unsafe criterion, even of its actual utility, is evident from the fact that the general introduction of manufactured articles is as often effected by extensive and judicious advertising, activity in putting the goods upon the market, and large commissions to dealers, as by the intrinsic merit of the articles themselves. The popularity of a proprietary medicine, for instance, would be an unsafe criterion of its real value, since it is a notorious fact that the extent to which such preparations are sold is very largely dependent upon the liberality with which they are advertised, and the attractive manner in which they are put up and exposed to the eye of the purchaser. If the generality of sales were made the test of patentability, it would result that a person, by securing a patent upon some trifling variation from previously known methods might, by energy in pushing sales or by superiority in finishing or decorating his goods, drive competitors out of the market, and secure a practical monopoly, without in fact having made the slightest contribution of value to the useful arts."

[17] Although commercial success of a product may under some circumstances be persuasive as evidence of invention (Tropic-Aire, Inc. v. Sears, Roebuck & Co., 8 Cir., 44 F.2d 580, 591, certiorari denied, 282 U.S. 904, 51 S.Ct. 217, 75 L.Ed. 796; Temco Elec. Motor Co. v. Apco Mfg. Co., 275 U.S. 319, 48 S.Ct. 170, 72 L.Ed. 298), it is by no means conclusive (Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 56, 43 S.Ct. 322, 325, 67 L.Ed. 523; McClain v. Ortmayer, 141 U.S. 419, 429, 12 S.Ct. 76, 35 L.Ed. 800) and in fact may not even be resorted to for that purpose, unless the question is in doubt. Textile Machine Works v. Hirsch Textile Machines, Inc., 302 U.S. 490, 498, 58 S.Ct. 291, 294, 82 L.Ed. 382; Stearns & Co. v. Grove's Laboratories, 8 Cir., 87 F.2d 822; Caton Printing Co. v. Daniels Mfg. Co., 7 Cir., 72 F.2d 993; Aro Equipment Corp. v. Herring-Wissler Co., supra note 4; Tropic-Aire, Inc. v. Sears, Roebuck & Co., supra, at page 592.

the result obtained was merely a change in degree." In the present case it may as pertinently be said: While appellant has produced an adhesive, cohesive—pressure sensitive, unified—tape, of greater relative adhesion than Teague, and greater relative cohesion than Healy, the result obtained was merely a change in degree.

In view of our determination that there was no invention, it is not necessary to consider the other contentions or assignments.

Affirmed.